STATE v. FRANK EUGENE ESTER.

140 N. W. (2d) 331.

February 4, 1966—No. 39,763.

*Edward W. Bergquist,* for appellant.

*Robert W. Mattson,* Attorney General, *George M. Scott,* County At-

torney, and *Theodore R. Rix,* Assistant County Attorney, for respondent.

FRANK T. GALLAGHER, C.

This is an appeal from a judgment of conviction in district court.

It appears that on the evening of June 11, 1964, four adults were gathered in the apartment of Cecilia Shelby in north Minneapolis, Mrs. Shelby; her friend, Freeman Parker; her sister, Sarah Crittenden; and the defendant, Frank Ester. Two grandchildren of Sarah's, aged 3 and 4, were also present.

According to the evidence, during the course of the evening all of the adults were drinking intoxicating beverages, the amount of which is not clear as one witness said they were drinking and had a bottle of gin; another recalled they had beer and either whiskey or gin; and the defendant said that they drank a fifth of gin among the four of them and that he also drank some beer. There was also testimony that prior to gathering at the apartment, Parker, Mrs. Crittenden, and defendant had been drinking elsewhere. Mrs. Shelby stated that the defendant appeared sober upon arrival, but she could tell that Mrs. Crittenden "had had a drink or two." In any event, defendant said that at the time he left, all four were intoxicated.

According to defendant's testimony, he and Mrs. Crittenden arrived at the Shelby apartment between 7:30 and 8 o'clock that evening. The witnesses seemed to substantially agree that the defendant first left the apartment alone between 10 p. m. and 11 p. m. Prior to leaving, defendant announced that he was tired and had to get up early the next day. He said he asked Mrs. Crittenden if she was ready to go with him and when she said "No," he left alone.

The defendant said that by the time he got downstairs Mrs. Crittenden sent her grandson down to tell him "she also wanted to go home" and he went back to get her. At this point there is a substantial variation between the witnesses as to just what happened. Mrs. Shelby said that when defendant came back, one word led to another and Mrs. Crittenden fell; that she told him to pick her up, which he did, and then he knocked her down and stomped on her and grabbed her by the ankles and was pulling

her towards the door. Parker stated that the defendant dragged her by the feet down some 12 or 14 steps but that he did not see either of them when they got to the bottom of the stairway.

Defendant testified that when he came back up the stairs he asked her if she was ready to go home and she replied she was; that she got up and then fell backward on her back; that he picked her up by holding her "under both her arms" with his arms and started for the back stairs. He stated that when they got to the back steps both of them fell "almost all the way down the steps." He denied that he ever stomped on her, kicked her, or struck her with his fist. He claimed that after they came to rest at the bottom of the stairs, he picked her up and they drove in his car to her home where he helped her to her apartment and where she sat and then lay down on her bed. At that time he noticed a cut on her chin and wiped the blood from her face with a towel. He said that she was fully conscious and asked for her "mornings," an alcoholic drink to be set by the side of the bed for drinking upon awakening. He got it for her and said he then left the place about 11 or 11:30 p. m.

Mrs. Crittenden's daughter, Diane, who was living with her mother, testified that she arrived home about midnight or early in the morning of June 12. She was accompanied by two friends who did not testify. She said that when she got there she saw "Frank Ester [defendant] and my mother and my two kids"; that Ester was standing close to the bed where her mother was lying and the children were asleep in another room. She described her mother's face as "all bloody" and swollen. She asked her what happened and her mother replied, "Frank beat me up." The witness claimed that she asked him why he did it. (The defendant denied that he saw Diane or had any conversation with her that night.) After describing other details, Diane said that she called the police who came to the apartment and called an ambulance which took her mother to the Hennepin County General Hospital where, according to the transcript, she died on June 22, 1964.

All of the medical evidence in this case was the testimony of Dr. John Coe, Hennepin County medical examiner and director of pathology at the hospital and an associate professor in the Department of Pathology at the University. Dr. Coe did not treat the patient but said he re-

viewed the hospital records concerning her condition and personally performed a post-mortem examination and autopsy. He explained the procedures in a post-mortem examination and said that the examination revealed some mild trauma about Mrs. Crittenden's face consisting mostly of some hemorrhage in the left eye and some evidence of trauma in the abdominal cavity; bleeding into the mesentery of the colon; rather extensive bleeding into the left rectus muscle; and an area of bleeding in the left lobe of the liver, all of which appeared due to a blow or blows of some type. The patient had been operated on in the abdominal area while in the hospital and there was an abscess at the lower end of the surgical incision.

The doctor further stated that the examination of the heart revealed no significant abnormality; that the lungs were heavy and an excessive amount of fluid was present; and that he found "some evidence of inflammation in the lung or bronchial pneumonia." The liver, besides showing an area of bleeding, showed some changes consistent with fatty metamorphosis. The adrenals showed evidence of focal necrosis. The kidneys looked normal but microscopically showed changes indicative of shock and septicemia. The witness said that septicemia involves "bacteria getting in and spreading everywhere in the body." It refers to a condition in which there is bacteria in the blood stream producing a septic course. The patient runs a high fever, the white blood cells increase remarkably, and the patient looks the same as people with a severe infection because the bacteria are actually in the blood stream. The doctor said, "We felt that the place where the bacteria got into the blood stream was in the abdomen at the end of the surgical incision."

The medical records indicated that Mrs. Crittenden was in a state of shock when admitted to the hospital, meaning that her blood pressure was low and her pulse rapid. She was given blood which brought her blood pressure back to normal at first but again on several occasions she went into shock with the blood pressure falling. At the same time she apparently developed some abdominal signs that led the surgeons to believe that she might have a ruptured spleen.[1] When asked if there were any

---

[1] In that connection the doctor testified: "The doctors felt because of the recurrent shock and the abdominal symptoms that the patient probably had a

broken bones in Mrs. Crittenden's body, the witness said she had a broken nose and that there were bruises on her face and neck. Although these and the internal bleeding were characterized by Dr. Coe as secondary to trauma, the doctor said it was his opinion that she died as a result of septicemia.

Defendant was indicted for the crime of first-degree manslaughter under Minn. St. 609.20(2),[2] and a jury found him guilty of aggravated assault under § 609.225.[3]

Defendant assigns as error: (1) That the court erred in refusing to grant his motion to dismiss his indictment made at the end of the state's case and the end of his case; and (2) that it erred in submitting to the jury the issue as to whether he was guilty of aggravated assault. He questions whether the jury could disregard the uncontradicted testimony of Dr. Coe that the victim of the assault did not sustain great bodily harm; whether a person can be convicted of aggravated assault on the ground that the acts constituting the assault were violent even though the actual injuries to the victim do not come within the statutory definition of great bodily harm; whether the jury could consider the charge of first-degree manslaughter where the evidence established that the death was caused by surgery; whether this evidence was insufficient as a matter of law to show that the acts constituting the assault were committed with such

---

ruptured spleen and was bleeding internally. It was on this basis that an operation was performed. At the operation they found some evidence of bleeding about the liver area but there was no rupture of the spleen and so the patient was simply closed up again."

[2] Minn. St. 609.20(2) (L. 1963, c. 753, § 609.20[2]) provides: "Whoever does any of the following is guilty of manslaughter in the first degree * * *:

\* \* \* \* \*

"(2) Causes the death of another in committing or attempting to commit a crime with such force and violence that death of or great bodily harm to any person was reasonably foreseeable, and murder in the first or second degree was not committed thereby."

[3] Minn. St. 609.225, subd. 1 (L. 1963, c. 753, § 609.225, subd. 1), provides: "Whoever intentionally inflicts great bodily harm upon another may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $10,000, or both."

force and violence as to make death or great bodily harm reasonably foreseeable; and whether the defendant, when found guilty of a lesser offense, is prejudiced by the erroneous submission to the jury of the greater offense.

With respect to defendant's first assignment of error, his counsel at the end of the state's case moved for a dismissal on the grounds that the state had failed to prove a prima facie case of defendant's commission of first-degree manslaughter under Minn. St. 609.20(2). In the motion his counsel stated:

"* * * Specifically I bring to the Court's attention that the medical testimony has shown that it was not reasonably foreseeable that this woman would die with the cause of death with which she did die. Even as much as two days later when the operation was performed, and as also was admitted by the doctor, it was not reasonably foreseeable that certainly an operation would be necessary to be performed which in turn would lead to the kind of circumstances of an improper diagnosis, which would in turn lead to the death of the deceased woman. As such, the State has failed to prove that the cause of death was a reasonably foreseeable thing as is necessary under this statute."

With respect to the question of great bodily harm, his counsel further stated:

"* * * I call the Court's attention to 609.02, Subdivision 8, which defines the same as being a bodily injury which causes—creates a high probability of death, of which there has been no testimony as to that, or which causes a serious, permanent disfigurement, and the only testimony on that was that there was no permanent disfigurement, or which causes a permanent or protracted loss of the function of any bodily member or organ, and there was no testimony, the doctor specifically testifying that such was not the case, or that there was a permanent or protracted impairment of the function of any bodily member or organ, and the doctor specifically testifying that such was not the case, having got quite involved, in fact, in testifying in regard specifically to the liver. The only other part of that section being as to other serious bodily harm, and I don't see how that this has been fulfilled when all of the other

testimony has been specifically controverted as to the fact that there was impairment or injury of any bodily member or function, and accordingly I feel that the State has failed to prove a case of manslaughter in the first degree."

In response to this argument, the state's attorney said:

"* * * [W]e are in agreement that the State has not shown by any testimony that there was in fact an establishing of great bodily harm on the theory of bodily injury which created a high probability of death, but we say that the evidence justifies this court submitting this question to the jury of whether or not the assault, acts that have been described here, and the evidence, caused a great bodily harm which was reasonably foreseeable."

Counsel for the state then argued that there was evidence of the impairment of a function of a bodily member; that there was immobility of the victim after the assault "which goes to a showing of a protracted impairment of a function"; and that there was the doctor's testimony that the patient's liver was in such a condition from the traumatic injury that it required hospitalization for treatment for about a month to restore it to full functioning powers. He contended that it was a jury question as to whether this was the kind of harm that was reasonably foreseeable. The court, after further discussion with counsel of the testimony as to what defendant did to the victim and of the doctor's testimony as to the nature of her injuries, agreed and denied the motion.

At the end of defendant's case, his counsel again renewed his motion for dismissal on the same grounds as before and because of the "lack of proof by the State, no evidence has been furnished that there are reasonable grounds by which reasonable men could differ as to the validity of the charges." The court denied that motion also.

Thereafter, the court instructed the jury that the indictment for the crime of manslaughter in the first degree charged that defendant "did wilfully, unlawfully, wrongfully, knowingly and feloniously, while in the act of committing a crime, to-wit: Assault, cause the death of a human being, to-wit: Sarah Crittenden, by then and there beating, striking, dragging and kicking the head and body of the said Sarah Crittenden with

such force and violence that death or great bodily harm of the said Sarah Crittenden was reasonably foreseeable, thereby and in said manner inflicting upon the person and body of the said Sarah Crittenden mortal wounds, of which mortal wounds she, the said Sarah Crittenden thereafter died * * *."

The court further explained to the jury that the defendant had pleaded not guilty and notwithstanding the charge in the indictment came into court clothed with the presumption of innocence. The court in a very comprehensive manner explained to the jury all its duties; reviewed the claims of the state; defined the crimes of manslaughter in the first degree, aggravated assault, and simple assault; and explained the meaning of "beyond a reasonable doubt." The court thereafter submitted to the jury four forms of verdicts—one for finding the defendant guilty of manslaughter in the first degree; another for finding him guilty of aggravated assault; a third for finding him guilty of assault; and a fourth for finding him not guilty. No objections were taken by defendant to the charge. After the jury found defendant guilty of aggravated assault, no motion for a new trial was made.

The state cites State v. Bram, 197 Minn. 471, 267 N. W. 383, a criminal case in which the principal contention of the defendant on appeal was that the court's charge was erroneous. We held in that case that where no exceptions were taken to the charge and where there were no requests for further instructions and no motion for a new trial, the alleged error in the instructions could not be assigned as error in this court. We recognize that rule but believe that here the defendant protected his record in his twice-repeated motions for dismissal of the first-degree manslaughter charge.

It will serve no useful purpose to go into detail as to all the legal issues raised by the defendant on appeal. It is our opinion under the facts and circumstances here that defendant's motion for dismissal of the manslaughter charge made in the indictment should have been granted, either at the end of the state's case or at least at the end of defendant's case. At the completion of Dr. Coe's medical testimony it was obvious that defendant could not have been found guilty of manslaughter in the first

degree as charged in the indictment. It was the doctor's uncontradicted opinion that Mrs. Crittenden died as a result of septicemia.

Neither is it necessary for us to go into a detailed discussion as to whether the defendant was prejudiced by inclusion of the first-degree manslaughter charge in the court's submission of the case to the jury when he was convicted of the lesser crime of aggravated assault. While it can be argued that giving the jury the first-degree manslaughter charge and then the aggravated assault charge may have so prejudiced the jury that it settled for a lesser crime, we feel that the manslaughter charge should not have been given and that in fairness to the defendant a new trial should be granted.

Reversed and new trial granted.